SOUTHWESTERN PRESBYTERIAN UNIV. *v.* CLARKSVILLE.

.*(Nashville.*    December Term, 1923.)

1. **JUDGMENT.**   Doctrine of res adjudicata inapplicable where parties not the same.

A decree in a suit by a university and its directors against certain synods claiming control of the university, enjoining the removal of the university from a certain city, was not *res adjudicata* in a subsequent suit against the city and others, where the city was not a party to the first suit, and its rights were not in issue. (*Post, pp.* 262-265.)

2. **COURTS.**   When rule of stare decisis inapplicable.

The elements of the rule of *stare decisis* were wanting, where no rule of property or of practice was established for the guidance of the public generally, upon which could arise or have arisen rights to be disturbed; the decision being made on the facts presented and the then alignment of the parties in interest.   (*Post. pp.* 262-265.)

Acts cited and construed:   Acts 1875, ch. 142.

3. **JUDGMENTS.**   Decree construed in light of pleadings.

A decree must be construed in the light of the pleadings, particularly the prayer of the bill and the apparent purposes in the minds of the draughtsmen and of the court.   (*Post, pp.* 262-265.)

4. **JUDGMENT.**   Directors of university held not concluded by a decree obtained by them enjoining others;   ''permanent;''   ''perpetual.''

A decree entered at the instance of the directors of a university, restraining synods from interfering with the management of the university and from removing it out of the State and adjudging that under its charter and certain conveyances the institution was "permanently" located at C., *held* not to conclude the directors in a subsequent suit by them for instructions, wherein

it was sought by such directors to remove the university, as "permanent" is not synonymous with "perpetual," but is used in contrast with temporary, and does not convey the idea of "never" changing. (*Post, pp.* 265-267.)

Case cited and approved: Mead v. Ballard, 7 Wall., 290.

5. **COLLEGES AND UNIVERSITIES.** Removal cannot be restrained on theory of trust resulting in favor of donors of contributions.

The power of lawfully constituted authorities of a university to proceed by steps authorized by law to relocate its *situs* cannot be restrained upon the theory of a trust resulting in favor of the city or other donors of contributions conditioned upon permanency of location within that particular community, however large or numerous, but such conditions can at most give the donors the right to withdraw their contributions in case of removal. (*Post, pp.* 267-270.)

6. **COLLEGES AND UNIVERSITIES.** Recital of location in charter does not affect right of directors to relocate.

Though charter of university named the city where it was to be located, *held*, that the proper authorities might relocate the university, in view of Acts 1875, chapter 142, section 2, authorizing dissolution of general welfare corporations, Acts 1897, chapter 116, and Acts 1907, chapter 304, authorizing the directors to amend the charter, and Acts 1895, chapter 6 (Shannon's Code, sections 2530-2533), authorizing consolidation of educational institutions. (*Post, pp.* 270-282.)

7. **COLLEGES AND UNIVERSITIES.** Statute as to consolidation valid.

Act 1895, chapter 6 (Shannon's Code, sections 2530-2533), relating to consolidation of educational institutions, is constitutional. (*Post, pp.* 270-282.)

Acts cited and construed: Acts 1875, ch. 142, sec. 2; Acts 1897, ch. 116; Acts 1895, ch. 6; Acts 1907, ch. 304.

149 Tenn.—17.

Cases cited and approved: State ex rel. v. University, 115 Tenn., 245; State ex rel. v. Vanderbilt University, 129 Tenn., 279; People v. Trustees of Geneva College, 5 Wend. (N. Y.), 212; Hascall v. Madison Univ., 8 Barb. (N. Y.), 175; Albany College v. Montieth, 64 Or., 357; Rogers v. Galloway Female College, 64 Ark., 627; Williams College v. Danforth, 12 Pick. (Mass.), 541; Packard v. Thiel College, 209 Pa., 350; Anderson-Dulin-Varnell Co. v. J. W. Williams et al., 255 S. W., 597; Shelton v. King, 229 U. S., 90.

Codes cited and construed. Secs. 2530-2533.

8. **COLLEGES AND UNIVERSITIES.** Recital in conveyances of purpose of establishing educational institution at certain place held not a condition.

Conveyances for the purpose of establishing an educational institution at a certain city, in order to advance the cause of education in the State and throughout the Southwestern States, thus coupling the location with a statement of the general purpose, *held* not to create conditions requiring the institution to be located perpetually at such place. (*Post, pp.* 282-287.)

9. **CHARITIES.** Conditions relied on to work forfeiture must be created clearly.

Conditions, when relied on to work a forfeiture of donations to a university, must be created by express terms or clear implication, and are construed strictly. (*Post, pp.* 282-287.)

Cases cited and approved: Ramsey v. Edgefield & Kentucky R. R. Co., 3 Cooper, Chancery, 175; Fitzgerald v. Modoc County, 164 Cal., 493; Higbee v. Rodeman, 129 Ind., 244; Heaston v. Board, 20 Ind., 398; Schipper v. St. Palais, 37 Ind., 505; Sumner v. Darnell, 128 Ind., 38; Downen v. Rayburn, 214 Ill., 342; King College v. Anderson, 255 S. W. (Tenn.), 374; Mead v. Ballard, 7 Wall. 290; Adams v. First Baptist Church, 148 Mich., 140; Greene v. O'Connor, 18 R. I., 56; Packard v. Ames, 16 Gray (Mass.), 327; Barker v. Barrows, 138 Mass., 578.

Southwestern Presbyterian Univ. v. Clarksville.

Case cited and distinguished:   Murdock v. Mayor & Aldermen of Memphis, 47 Tenn., 483.

10. **COLLEGES AND UNIVERSITIES.**   City held entitled to return of donation on relocation of university.

Where city, to induce location of sectarian university, there delivered to it $50,000 in bonds, on condition that the city should have at all times as many as ten students in the university, it was entitled to a return or refund of the bonds if the university subsequently relocated; a contractual obligation being created in view of the city's doubtful authority to spend  funds outside its limits or to make gratuitous contributions to sectarian institutions. (*Post, pp.* 287, 188.)

11. **MUNICIPAL CORPORATIONS.**   Disposition of public funds presumed not intended as gift.

A presumption arises, not imputable to individual donors, that a city's contribution of public funds to a university is intended as a payment, or exchange for value, rather than a gift, and that a material return is contemplated, especially if the party with whom it deals is a sectarian organization to which otherwise its lawful right to contribute would be questionable. (*Post, pp.* 288-290.)

## FROM MONTGOMERY.

Appeal from the Chancery Court of Montgomery County.—HON. J. W. STOUT, Chancellor.

JNO. BELL KEEBLE and CURRELL VANCE, for appellants.

DANCEY FORT and AUSTIN PEAY, for appellee.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

. This bill in equity is brought by the directors of Southwestern Presbyterian University, an educational institution chartered under the General Corporation Act of 1875, chapter 142, joining the Presbyterian Synods of Tennessee, Louisiana, Mississippi, and Alabama as complainants, seeking instructions in the exercise of their trust, particularly in the matter of a proposed relocation of the university now located at Clarksville; it being alleged that after nearly fifty years of operation at Clarksville a change is imperative, if the educational objectives of the trust are to be carried out. The propriety, if not the necessity, for this application, before taking definite steps unanimously agreed by the directors in charge to be absolutely necessary, grows chiefly out of the fact that in a former litigation a decree was entered enjoining the defendants in that cause, the Presbyterian Synods, now joined as complainants, "from taking any steps towards the removal of the said university, or its property, equipments, or endowments from the city of Clarksville, in Montgomery county, Tenn., to the city of Atlanta, Ga., or to any place, or from doing anything tending to said removal;" this decree having been pronounced by this court at its December term, 1904, in a suit brought by the university and its then directors against the aforesaid synods and their officers.

The City of Clarksville was not a party to that proceeding, substantially the rights and interests it herein sets up being then effectively represented by the then defendants, now complainants, and it does not now, as we understand, and manifestly could not successfully, rely here upon *res adjudicata*, but, while conceding this much, and recognizing the right of the complainants in their capacity

as trustees to apply to a court of equity for instructions, it denies that any relief as prayed for should be granted, the effect of which would be to approve or empower action by the directors looking to the removal of this institution from the city of Clarksville. And it relies upon alleged vested rights and associated equities of the city of Clarksville attaching to the properties involved, and invokes the application of the doctrine of *stare decisis*. These rights and equities, to a greater or less extent dealt with in the former suit, grow out of the history of this institution in its relation to the city of Clarksville, with particular reference to the acquisition of portions of its personal and real properties, it being insisted that transfers and donations to the institution at various stages of its history were made upon the condition, either express or implied, of its permanent, or even perpetual, location and operation in the city of Clarksville. These matters will be further considered in the progress of this opinion.

From a decree of the court of civil appeals dismissing the bill, its opinion being that "the dominant and controlling question in the case is, as before stated, governed by the decision of our supreme court in the former litigation mentioned"—that question, broadly stated, being the right of removal from the city of Clarksville—complainants have by proper proceedings brought this record here and assigned errors.

While the assignments are eight in number, we conceive the pertinent issues to be, first, whether or not the present complainants are so bound by the former adjudication relied on as perpetually to preclude them, or their successors in the trust, from removing the corporate *situs*, or prop-

erties, from the city of Clarksville, regardless of changing conditions and occurring exigencies; second, if not so bound, do the composite facts appearing support the insistence that this is an educational trust which has in its upbuilding been so hedged about by conditions coupled with the transfers and donations made to it, or for its use, as to justify a court of equity in denying to its authorized directors the powers of control which otherwise and ordinarily they might exercise; third, if not, then what are the lawful powers of these directors incident to the issues presented, and what are the proper proceedings by law provided; fourth and finally, if a removal may be had, was the specific municipal donation of bonds made by the city of Clarksville, or other grants or donations, so conditioned as to require the return or abandonment thereof to the donors or grantors upon such removal. We shall now proceed to a consideration of these several propositions in the order named.

First. As before indicated, the doctrine of *res adjudicata* is inapplicable. But were the issues presented in the former suit, the situation of the subject-matter and of the parties and the terms of the decree such as to be determinative of those now before us? Clearly elements entering into the fully recognized rule of *stare decisis* are wanting. No rule of property or of practice was established for the guidance of the public generally upon which could arise, or have arisen, rights to be disturbed. At most, the effect of that holding was that, on the facts presented, the then alignment of the parties in interest, the unamended charter powers of the corporation and all else appearing, the removal should not be made. The gist of

the contest then was as to whether the synods of the church, or the legally constituted directors under the charter of the corporation, should control its affairs, and whether or not these synods should be permitted to exercise control in so drastic and fundamental a matter as the uprooting of this Tennessee corporate educational institution from the soil of our State and the transplanting of it, root and branch, in a foreign territory. Quite rightly this court said, "No," and proceeded to decree (1) that this institution was a Tennessee corporation; (2) that it had been lawfully established at Clarksville in this State; (3) that by virtue of the conveyances to it and the provisions of its charter it had been permanently so located; (4) that neither the Presbyterian Church, nor its synods, nor any other persons, had the right to remove it, or its property, from this State and locate it elsewhere, but that it should be maintained where it had been lawfully located; (5) that the synods have the right to elect its directors; and (6) that therefore the trustees or directors are without power to choose their own successors, but that these are to be chosen by the synods in accordance with the prevailing plan and custom; and (7), finally that the synods, "and their stated clerks and moderators be and they are hereby forever perpetually enjoined from taking any steps towards the removal of the said university, or its property, equipments, or endowments from the city of Clarksville in Montgomery county, Tenn., to the city of Atlanta, Ga., or to any place, or from doing anything tending to said removal." The decree of this court is thus fairly epitomized. It will be observed that the injunction clause (7), copied above, is properly limited to the de-

fendant synods and their officers, this being in harmony. with the prayer of the bill, but neither the trustees and directors then serving, nor those now complainants, were affected by this order. On the contrary, it was procured at their instance. And it is apparent from a reading of the pleadings, including this decree, that the issue now presented of the right of removal by unanimous action of the lawfully chosen directors, in the exercise of their sound judgment of the best interests of their trust, after or upon proper statutory charter amendments, to a point within this State, was not before or passed upon by the court. The decree in terms finds that the corporation was chartered, "for the purpose of establishing and maintaining in the city of Clarksville, county of Montgomery, State of Tennessee, a university with power to confer degrees"— which is strictly in accord with the provisions of said charter. In support of the insistence that the complainants in the present suit are precluded by this adjudication language appearing only in paragraphs 3 and 4 of the decree is, with any degree of pertinency, relied on. Paragraph 3 recites:

"That by the terms of the deeds of conveyance in the transcript of the record mentioned, and the terms of the charter of said corporation, the said institution or university was, and is, permanently located at Clarksville, in Montgomery county, in the State of Tennessee."

And fourth: "That neither the Presbyterian Church of the United States, nor any synods thereof, particularly the synods thereof mentioned in the pleadings, to-wit, the Presbyterian Synod of Oklahoma, the Presbyterian Synod of Louisiana, the Presbyterian Synod of Mississippi, the

Presbyterian Synod of Tennessee, nor any moderators or officers thereof, nor the trustees, nor directors of the said Southwestern Presbyterian University corporation, nor any other person, company, association, or corporation, has any right, power, or authority to transfer or remove the said university or college, or any of the assets or property of the said corporation from the State of Tennessee, or to locate the same elsewhere than within the limits of the State of Tennessee, and that the said institution must be maintained at Clarksville, Montgomery county, Tennessee."

The issue presented being the proposed removal from Clarksville, Tenn., to Atlanta, Ga., the adjudication is that no right or power exists to remove the university or its properties and "locate the same elsewhere than within the limits of the State of Tennessee;" and, stating the same conclusion conversely, the natural alternative, and the only one proposed, followed, in the language used, "and that the said institution must be maintained at Clarksville, Montgomery county, Tenn.;" that is, it may not be removed from this State, it cannot be thus taken away, it must be left where it is.

This language of the decree must be construed in the light also of the pleadings, particularly the prayer of the bill, and the apparent purposes in the minds of the draughtsmen and of this court. The prayer was (1) for an injunction to restrain the defendants, or any of them (not the complainants) from taking steps towards the removal; and (2) that "your honor construe the charter of this organization under the laws of the State, and the deeds, contracts of location, and donation to said univer-

sity, and *determine the rights, if any, which the defendant synods have over said university,* and to also construe and determine the rights, duties, and responsibilities of the other complainants then the university, as directors thereof, and of their responsibilities, duties, and connection *with reference to the respective synods, which elected them,* and enter a decree determining that said university cannot be removed from the city of Clarksville, Tenn." The italics are ours, and the italicised language, "with reference to the respective synods which elected them," are fairly to be construed as qualifying and prescribing the meaning of the preceding language of the prayer calling upon the court for a determination of the rights, duties, and responsibilities of the directors. In other words, the *prayer in effect sought direction and adjudication* with respect to the relations of the synods attempting to exercise control and the director complainants claiming the right of control. We think it apparent that the purpose of the bill and the object of the decree was not to conclude the complainants therein, the lawfully selected directors, who were not seeking a removal, but actively resisting it, from acting at some future time by lawful procedure, as the performance of their trust might require, but was intended to conclude clearly, definitely, and permanently the defendant synods from unlawful interference with the conduct of the institution, and the adjudication cannot now therefore be treated as controlling in the present proceeding. In this connection it may be remarked that the use of the words "permanently located" in the third paragraph is not inconsistent with this conclusion. "Permanent" is not synonymous with "perpetual." It is used in

contrast with temporary—as a permanent residence, rather than a transient, or a permanent road, rather than a makeshift—but in ordinary acceptation it does not convey the idea of never changing. One adopts a permanent location, or occupation, meaning only that the adoption is made without present contemplation of change, but subject always to exigencies or inducements of circumstances which may arise. The words "permanently located" used in a conveyance of land to an incorporated institution were construed by the supreme court of the United States in an early case not to mean perpetually. *Mead* v. *Ballard,* 7 Wall., 290, 19 L. Ed., 190.

And so, if the language in paragraph 4 should be construed to include at that time, for the purposes of that litigation, the directors of the corporation—that is, if they took a decree against themselves, the adjudication that they were without right or power to remove the university must be limited to the conditions then existing, the authority then conferred, and subject to changes which they might lawfully bring about, or which might be the result of legislative action. It follows that the former adjudication relied on is not conclusive in the pending cause.

Second. It is strongly and ingeniously argued that, contrary to the rule which recognizes the right of directors of a general welfare corporation, organized under the act of 1875, to conduct, practically untrammeled, the affairs of their organization, including, of course, the right of relocation, as to the exigencies in their judgment may require, these directors are limited in the latter regard, at least, by the fact that (1) the charter names the city of Clarksville, the alleged controlling effect of which recital

will later on be discussed; and that (2) various convey-
ances and donations to this corporation are so conditioned
as to effect this result.

The insistence of learned counsel for Clarksville is thus
stated:

"Our position is that the Southwestern Presbyterian
University is the trustee of a charitable and educational
trust, holding all of its property for the performance and
administration of a specific trust, which it will not be per-
mitted to breach by the application of its assets and funds
to a different object, since its trust was specifically created
as an educational institution at Clarksville, Tenn. We
want no right of re-entry. We want the trust to be ad-
ministered."

Assuming that the recitals relied on in the instru-
ments of gift or conveyance could be construed as estab-
lishing a trust at all, we find ourselves unable to follow
counsel to their conclusion that the beneficiary of this
charitable and educational trust was the city of Clarks-
ville, that its objective was thus directed and limited, that
the controlling purpose of those who conveyed to it, or gave
to it, was thus local, but we are constrained to the opinion
that the primary aim and purpose was Christian education
under the auspices of this great denomination, and that the
location at or in a particular community was an incident
only; the selection of a location being then made with a
view to advancing and promoting the main objects of the
trust as a means to the desired end. It would seem to fol-
low that whenever the location could no longer be made to
serve effectively the fundamental purposes of the trust, the
duty of the trustees to change that location would be plain.

Moreover, the conveyances and donations were in this case all directly made to a corporation chartered by the State to hold such property and conduct an educational institution, and, whatever may be the rights reserved to various grantors or donors to this corporation, we are aware of no authority to the effect that conditions or reservations in transfers of property to a corporation such as this may have such cumulative or composite force as to establish a trust in favor of a perpetuity of location as herein contended for. These contributions to the general welfare corporate organization, made from time to time, must each stand upon its own bottom, and cannot be massed and given the cumulative effect insisted upon on behalf of the city of Clarksville. We do not conceive that the general conduct, management, and operation of the corporate entity, nor the handling of its properties generally, can be so controlled, whatever may be the rights reserved to individual contributors in whatever form. One may attach such conditions to his contributions as to support his right to withdrawal thereof, upon a violation of such conditions, but his rights, or those of a group so situated, must be so limited. Otherwise it would result that the lawfully constituted directors would be divested of their nondelegable powers, and the corporate control would pass to others who, however great their benefactions, may not thus be lawfully vested with such authority. Fundamental principles of corporate control would thereby be violated. So that the power of the lawfully constituted authorities of the Southwestern Presbyterian University to proceed by properly authorized steps, provision for such steps being by law provided, to relocate its *situs,* cannot

be restrained upon the theory of a trust resulting in favor of the city of Clarksville, or other donors to the corporation, growing out of contributions conditioned upon permanency of location within that particular community, however large or numerous.

Analyzed, the pertinent inquiry must be, not do the limitations, restrictions, or conditions, express or implied, attached by grantors and donors, operate to prevent the corporation from moving, but to what extent when it goes may it lawfully carry with it these benefits. This will be further considered hereinafter.

Third. Whatever may be true in other jurisdictions, in Tennessee general welfare corporations, organized under the act of 1875, have their rights fairly well defined. In the first place, by section 2 of chapter 142 of the Acts of 1875, unrestricted power is expressly conferred upon general welfare corporate members to, "at any time, voluntarily dissolve the corporation, by a conveyance of its assets . . . to any other corporation, holding a charter from the State, for purposes not of individual profit." The exercise of this broadly conferred power may not properly be restrained by the courts aside from fraud or evidence of corruptly induced manipulation. This method of procedure is then clearly open to complainants, acting presumably according to their judgment in the interest of the trust as a whole, unhampered by claims of individual benefactors whose particular or special interests may be adversely affected.

And, again, the power of amendment of such a charter as this is reserved to the State by the act of 1875 and conferred upon the directors, there being no stockholders, by

the amendatory acts of 1897 (chapter 116) and 1907 (chapter 304). It will be seen that authority to change the location, or principal office, of the corporation, as recited in the charter, is not expressly enumerated in the act conferring amendatory powers, but it will be observed, first, that this recital is not called for, and therefore not essential, in the form prescribed or the directions given, by the charter statute of 1875. Its omission originally would therefore have been immaterial, the operating location, chief place of business, or head office, being otherwise left subject to selection and adoption by the directors, upon organization under the charter, as is commonly the practice; and it follows that the recital of its location, as contained in this charter, is fairly to be construed as a nonessential and nonfundamental provision, and subject to amendment at the will of the directors. Counsel for Clarksville emphasize the importance of fixing by charter the location. As above indicated, the form prescribed by law for such charters makes no such requirements. The State is not concerned as to the detail of in which particular branch of its broad domain, within what county or other subdivision of its territory, this or that charitable or educational enterprise shall be located or conducted. It is concerned only in the general welfare of all its citizenship, and may properly and does leave to those groups of individuals organizing themselves for the prosecution of these worthy causes a free hand in this regard. And considering an amendment to a charter similar to this, this court has recognized and upheld, not only the power to amend, but the authority of a majority merely of the directors to apply for the amendment. As in that case, so

in this, the amendment under discussion is auxiliary and not fundamental, as hereinabove shown. *State ex rel.* v. *University,* 115 Tenn., 245, 246, 257, 259, 90 S. W., 294.

And yet again we find that, this being an educational institution, by the express terms of its charter under the patronage of the Presbyterian Church, the Act of 1895 (chapter 6) applies, by which provision is made for consolidation. While Mr. Shannon, bringing this act into his Code as sections 2530-2533, remarks in a footnote that it is not constitutional, he has evidently overlooked decisions of this court expressly sustaining its constitutionality. *State ex rel.* v. *Vanderbilt University,* 129 Tenn., 279, 348, 164 S. W., 1151.

It thus appears that in either of three methods above discussed the legislature has provided means by which this educational institution may, by authority of and pursuant to action of its directors, be relocated.

In support of the insistence, eloquently and forcefully made, that there exists no power, by charter amendment, or otherwise, in this corporation to effect its removal from its once adopted location, counsel cite the following cases: *People* v. *Trustees of Geneva College,* 5 Wend. (N. Y.), 212; *Hascall* v. *Madison University,* 8 Barb. (N. Y.), 175; *Albany College* v. *Montieth,* 64 Or., 357, 130 Pac., 633; *Rogers* v. *Galloway Female College,* 64 Ark., 627, 44 S. W., 454, 39 L. R. A., 636; *Williams College* v. *Danforth,* 12 Pick. (Mass.), 541; *Packard* v. *Thiel College,* 209 Pa., 350, 58 Atl., 670; and 216 Pa., 632, 66 Atl., 83.

Careful examination of each of these authorities has been made, and no one of them is found to be controlling. In the Geneva College Case the question was not the right

of removal, or relocation, but the scope of the franchise powers granted—whether the college located at Geneva could operate a department in New York City. In that case, moreover, the location had been originally definitely fixed in the charter by express designation of the authority granting the charter powers, and no question of the right of amendment was considered. In Tennessee, as already indicated, the legislature has not only provided for amendments at the option of the directors or trustees in charge, but leaves the initial selection of a location to the choice of the organizers without requiring that this detail shall be incorporated in the application for a charter. This court has recently held, in conformity with previous holdings, that the inclusion of provisions not called for by the particular form prescribed by the act of 1875 and its amendments for a charter for a specific business is ineffective for any purpose and will be treated as surplusage. *Anderson-Dulin-Varnell Co.* v. *J. W. Williams et al.,* 225 S. W., 597.

It is true that in *Hascall* v. *Madison University* a suit was brought by contributors to its funds to enjoin its removal from Hamilton, the place of its original location, and the injunction issued, but this case is otherwise to be clearly distinguished. The contributions had been made under a covenant by which the funds were contributed upon the express consideration and condition that the institution should be permanently located at Hamilton, and much emphasis is put by the court upon the reiterated use of this word "permanent," which is lacking in the documents now before us. Taken in its context and under the conditions appearing, the court held that the words

149 Tenn.—18.

"permanently located" must be construed as limiting the power of removal. And not only does the court expressly place its holding on the ground of the use of the word "permanent," but it proceeds to declare that, if the contributors "had merely stipulated for the location of the institution at Hamilton [as in the case of Clarksville now before us], Hamilton would have continued to be the location, in the contemplation of all parties, until some good reason should arise, sufficient, in the judgment of the trustees, to justify a removal," thus by clear implication supporting the right now contended for by the trustees of Southwestern University. Again, the court in the Madison University case clearly recognizes the legislative right to authorize the trustees to remove the institution upon proper compliance with the statute provided.

In the case of Albany College, suit had been brought by trustees of the college to quiet title to a parcel of land which had been deeded to the corporation, subject to certain express limitations with respect to the use of the land; these express limitations being wanting in the case now before us. It is significant, however, the limitations recited in this conveyance being "that, if the institution should cease to be under the Presbytery of Oregon, in connection with the general assembly of the Presbyterian Church, the conveyance should cease," that it was insisted that the relocation of the college in another part of the city of Albany and abandonment of the particular property conveyed for college purposes under control of the Presbytery, would give effect to the limitations and revest the title in the heirs, to which contention the court answered, in effect, that the particular location was not the essential consideration; that while the proceeds of sale

of the property could not be diverted to some other use than the support of an educational institution at Albany, this was the intent of the limitation, rather than a permanent use of the specific property conveyed. It is true that in that case the court uses language which would seem to confine the use of the proceeds to some portion of the town of Albany, but the principle is recognized, invoked in the present case, that the essence of the trust is not permanency of location in some specific location, but the support and development of higher education under the general control of the Presbyterian denomination. This it can hardly be denied was the dominant thought of the founders and most liberal patrons of the institution.

The Galloway College case was a suit to collect a subscription; the court holding that a contract conditioned upon location of the college "at" or "in" Searcy, Ark., was complied with by its location outside of the corporate limits. The question of relocation after a lapse of years was not in any way involved.

In the Williams College case the right of removal, if permitted by legislative action, was conceded, apparently, but the issue directly involved was one of liability upon a subscription which had been made by the defendant to the funds, which the court held binding. In that case, by the express terms of the subscription agreement, the college had bound itself to refund any sums paid in case of the removal of the college. We think this case has no application. It is suggested that it is cited as illustrating the enforcement of contributors' contracts as having mutuality, but that such contracts, when expressed in proper form, are enforceable is not questioned.

The charter of Thiel College was granted by a special legislative act, which in terms provided that it was "to be permanently located at such place in western Pennsylvania as the trustees hereafter may determine." The location at Greenville having been permanently made, as directed by the legislative act incorporating the college, the court held that the college could not be moved without an amendment of its charter. The supreme court upon appeal conceded the power of the lower court to so amend the charter, but concurred in the refusal upon the ground, among others, that, "the college was located permanently in Mercer county, in pursuance of a contract to which the present objectors were parties." The terms of this contract are not disclosed and cannot be here considered, but, regardless of any contract with contributors, it is apparent (1) that the legislature in that case undertook to provide for the fixing of the location permanently, as it did not do in the present case, and (2) no such provision for charter amendment upon the application of the directors had been made as is the case here.

A most painstaking analysis of these cases and of other authorities bearing upon the issues, made with full appreciation of the earnestness and ability with which the contentions are presented on behalf of the city of Clarksville and of the importance to the people of that community of the conclusions reached, convinces us that, on the facts presented, and in view of the applicable statutory enactments in force in this State, power is conferred upon the directors of this university, upon the proper adoption of methods heretofore outlined, to change the *situs* of the corporation and remove to such location as may be thus chosen within this State all of its properties, or their pro-

ceeds, except such, if any, as are held subject to conditions or restrictions limiting the right of removal.

Fourth. We come now to a determination of which, if any, of the properties held by the university come within the exception just above stated. Since the city of Clarksville alone of those who have made conveyances or contributions to this institution is before the court in this suit, and therefore alone of these can perhaps be bound or precluded by decree herein, consideration of the rights or claims of other contributors, or grantors, would not be pertinent, but for the fact that this is a proceeding brought in equity by the complainant directors in their capacity as trustees, seeking the advice and instructions of the court in the discharge of their trust, and even in this aspect we deem it proper to limit this opinion as hereinafter appears. An examination of the record fails to disclose the existence of such conditions or contractual limitations in the transfers to the university as would operate in law to effect a reversion to the grantors upon abandonment or change of use of the property. Nor do any such provisions so appear as to invoke a court of equity to require trustees voluntarily submitting to its jurisdiction to make return to contributors as a condition of this court's consent to a proposed removal, with the expection of the municipal contribution of the city of Clarksville, hereinafter considered.

The main grounds and other basic property of the university came to the present corporation by a conveyance upon its organization from Stewart College, by deed dated the 29th day of April, 1876; this college being at the time, and having been for some twenty years previous, in the control of the Presbyterian Synod of Nashville. At the same time the trustees of this college turned over, to

the successor university, pursuant to action of the synod, the equipment, endowment, and all assets of the Stewart College, without conditions.   This deed reads as follows:

"Know all men by these presents, that Stewart College, a corporation chartered by an act of the legislature of the State of Tennessee, in consideration of five dollars to it paid, and in order to advance the cause of education in the State of Tennessee, and throughout the Southwestern States of the Union has this day bargained and sold, and hereby does convey to the Southwestern Presbyterian University, a corporation organized under the laws of said State for the purpose of establishing a school at Clarksville, a lot of ground situated in the town of Clarksville, known in the plan of said town as out lot No. 5 (five), the same on which is built the structure known as the Stewart College; also conveys the lot lying to the east of and adjoining said lot, conveyed to Stewart College by Alfred Robb, being the same on which stands the dormitory building; also convey the lot conveyed to said College by Mrs. L. A. Faxon adjoining the dormitory lot alone; all said lands fronting on College street and forming a continuous front thereon.   To have and to hold said grounds and all the buildings thereon, to the said Southwestern Presbyterian University forever; and the said Stewart College, by its president and secretary executes this, the said officers acting by authority of the order and direction of the board of trustees."

It will be observed that the purpose is plainly stated to be "in order to advance the cause of education in the State of Tennessee and throughout the Southwestern States of the Union."   Incident to the description of the corporate grantee reference is made to it as, "a corpora-

tion organized under the laws of said State for the purpose of establishing a school at Clarksville," but the main and prime consideration and purpose had theretofore been clearly set forth.

Stewart Callege had acquired its title by a conveyance in 1856 from the Montgomery Masonic College; this deed reading as follows:

"Whereas, on the 28th day of June, 1853, the trustees of the Clarksville Academy conveyed to Montgomery Masonic College the grounds and buildings and appurtenances on which was situate the academy and college buildings, for the purpose of enabling the Masonic bodies of Montgomery county and trustees of said Montgomery Masonic College to keep up and sustain a first-class college and academy in said town, and the said trustees of Montgomery Masonic College having had said college under its management and control for two or three years and used their best endeavors to sustain said college with the assistance they could get from the Masonic bodies of Montgomery county, and finding that they were unable to pay the professors and teachers of said college and sustain the same, advised the Masonic bodies of the county which appointed them as trustees of the fact of such inability and desired of said Masonic bodies instructions, etc., as to what course to take with the said college and grounds, etc., by which the purposes could be carried out for which said grounds and buildings, etc., had been conveyed to them and said Masonic bodies advised and instructed them to convey same to such association as would pay the debts against the college and keep up and sustain a first-class college and academy in the said town of Clarksville. And the trustees of said Stewart College having agreed to pay said debts,

amounting to about $9,000, and the trustees of the Montgomery Masonic College having upon the above conditions agreed to pay (convey) to said Stewart College the said grounds and buildings and every appurtenance thereto, and said trustees of Stewart College having in pursuance of said agreement paid said debts; and whereas, at a meeting of the board of trustees of said Montgomery Masonic College, held on the 5th day of September, 1856, it was ordered by the board that the trustees of said college make a deed and convey to said Stewart College the said grounds and buildings and appurtenances in consideration of and for the purposes aforesaid, and that the president and surviving trustees of said college sign the said deed and convey the said college, grounds, and appurtenances: Now, in consideration of the premises, and of the said sum of $9,000 paid by the trustees of Stewart College, for and on behalf of said Montgomery Masonic College, we, the trustees, of said Montgomery Masonic College, and the said Montgomery Masonic College, do hereby transfer and convey to said Stewart College, for the purpose of keeping up and sustaining a first-class college and academy in the town of Clarksville, all the college and academy grounds, buildings, and appurtenances of every character and description, including apparatus, chemical, and philosophical. To have and to hold said grounds, buildings, and appurtenances to the said Stewart College, forever, for the purposes aforesaid."

Antecedent conveyances appearing in the record contain language of similar import, expressive of a purpose to establish a school or college in the city of Clarksville. What is the legal effect upon the title of complainant university of these recitals?

Generally speaking, an expression in a conveyance of the purpose to which the property granted is to be put is susceptible of various constructions, according to its context and the particular wording and other circumstances. It may create a trust, a condition precedent or subsequent, or be a covenant, according to the fairly to be presumed or definitely expressed intention of the grantor.

These conveyances above set out and other conveyances and contributions in which the location is named would appear to have been made, as is frequently the case, upon a -contemplation of location rather than a condition, a wish rather than a command. One may expect, or indeed, hope that a certain use of property or funds may be made, and yet, knowing the vicissitudes of time and the changes wrought by it, hesitate to attach conditions which may embarrass. It cannot be denied, as heretofore suggested, that the first thought of the founders of this institution, and of those both in Clarksville and elsewhere who have generously contributed to it, was not the conferring of a local advantage—as great an advantage as this movement has proven to the city of Clarksville, contributing through the past fifty years to the culture for which it has become distinguished—but was the Christian education of the young men of Tennessee and of the South and particularly those of the great denomination whose name this university bears. So that, if it be conceded, as this record clearly discloses, that the general and broader purposes of this so-called trust for the education of the young men of the South can be more perfectly and widely fulfilled by the removal of the institution to another field, then it is difficult to avoid the conclusion that the intentions of those who gave to it in other years and have now passed on will

be fully met by the adoption of this course. This much may fairly be said in response to the insistence that these trustees should be restricted in the matter of location by some evidences of intention on the part of donors in the past. And it here may be remarked that, even upon the theory of a trust, it is not apparent that it would be within the province of this court to control the action of the trustees in charge under the present conditions, protesting as they do the necessity of their proposed course for the salvation of their trust, and unimpeached as they are as to their motives.

"Formerly courts of equity supervised and controlled the exercise of discretionary powers by trustees. But it is now a well-settled principle that a trustee having the power to exercise discretion will not be interfered with by the court so long as he is acting *bona fide*. To do so would be to substitute the discretion of the court for that of the trustee." 26 R. C. L., 1373.

The language quoted is taken *verbatim* from the opinion of Mr. Justice LURTON in *Shelton* v. *King*, 229 U. S., 90, 33 Sup. Ct., 686, 57 L. Ed., 1086,

The language of the conveyances in substance provides at most only that they are made for the purpose of establishing an educational institution at Clarksville, Tenn., thus coupling the location with a statement of the general purpose. Such expressions of purpose are not construed to create conditions. As said by Judge COOPER in *Ramsey* v. *Edgefield & Kentuncky R. R. Co.*, 3 Cooper Chancery, p. 175, "such conditions, when relied on to work a forfeiture must be created by express terms or clear implication, and are construed strictly." This rule of con-

struction is axiomatic. We shall refer to a few of the many available cases in which it has been applied.

In *Fitzgerald* v. *Modoc County,* 164 Cal. 493, 129 Pac., 794, 44 L. R. A. (N. S.), 1229, where property was conveyed "to be used as and for a county high school ground and premises, for the county of Modoc, State of California," it was held that such a provision does not create a condition subsequent entitling the grantor to re-enter if the property is sold for other uses. The authorities are fully reviewed, and the court concludes its able opinion as follows: "Whatever that actual intent-may have been, it must have found adequate expression in the deed itself before it can be given either legal or equitable efficacy;" and also declared that, "reciting in a deed that it is in consideration of a certain sum, and that the grantee is to do certain things, is not an estate upon condition, not being in terms upon condition, nor containing a clause of re-entry or forfeiture."

In *Higbee* v. *Rodeman,* 129 Ind., 244, 28 N. E., 442, the conveyance was "for common school purposes," and the recitation that the "lot was donated for school purposes so long as it shall be used for such purpose," and yet the court held that "the language used in the deed from Dunn to the township specifies the use to which the property would be put, but does not even tend to create a condition subsequent." *Heaston* v. *Board,* 20 Ind., 398; *Schipper* v. *St. Palais,* 37 Ind., 505; *Sumner* v. *Darnell,* 128 Ind., 38, 27 N. E., 162, 13 L. R. A., 173. And with peculiar application to the present case, the court concludes:

"If the conveyance from Dunn to the township was upon a condition subsequent, the township having had the use of the property for school purposes from 1855 to 1885, a

period of thirty years, there has been a substantial compliance with the condition"—citing *Sumner* v. *Darnell,* supra, and other cases.

A deed construed by the supreme court of Illinois, *Downen* v. *Rayburn,* 214 Ill., 342, 73 N. E., 364, 3 Ann. Cas., 36, not only contained in the description the language, "a certain tract or parcel of land to be used as a church location, situated," etc., but the *habendum* clause read, "to have and to hold the said premises as above described, with the appurtenances," etc., thus apparently coupling these clauses. The court held that the power of alienation was not limited, and that a fee-simple title passed to the land, "uncontrolled by any condition, restriction, limitation, or reservation whatever." This opinion also confirms the view expressed in *Higbee* v. *Rodeman,* supra, although not referring to that case, that provisions of this nature do not contemplate or call for perpetual use, saying that the deed must have been made with knowledge that the location or vicinage of the lot might at some future time undergo such changes as to make it desirable to remove the church to some other location; that even a restriction in a deed will not be enforced, where the neighborhood or vicinage, where the property is located, has so changed in its character and environment and in the uses to which it may be put, as to make it unfit or unprofitable for the use to which it is restricted.

And see, as recognizing much the same principle, the recently rendered opinion of this court in *King College* v. *Anderson* (Tenn.), 255 S. W., 374.

The opinion of ANDREWS, J., in the case of *Murdock* v. *Mayor & Aldermen of Memphis,* 7 Cold., 483, is an exhaustive discussion both of the terms necessary to create a con-

dition subsequent and of conditions once performed. In that case title to a strip of alluvial land in the city of Memphis lying along the river edge was vested in the United States by a conveyance from the mayor and aldermen of Memphis for navy depot purposes. The deed from the mayor and aldermen of Memphis to the United States was without recitals of purpose or restriction of any kind, but some years after the lands were deeded back by the United States to the city of Memphis, which held the same at the bringing of the suit. The deed by which the city of Memphis had acquired the title from various grantors contained recitals relied on to establish either a condition subsequent, or a trust in favor of the grantors. The language used was, "give and grant unto the said parties of the second part, and their successors, forever, for the location of the naval depot aforesaid, all that portion of the alluvial land," etc. Says the court:

"It is claimed for the complainants, that the expression, 'for the location of the naval depot,' implies a condition that the estate conveyed should continue only so long as the premises should be used for the purpose indicated; that the premises being conveyed for a specified purpose, the parties must be presumed to have intended to convey only such estate as should suffice for that purpose; and that the estate should cease if the use were perverted. Such a condition is not expressed or implied in the words above quoted. The words used are not those usually employed to express a condition in grant. Other expressions may be used, however, for this purpose. 1 Washb. Real Prop., 445. The words express clearly the object had in view in making the conveyance. They imply a trust assumed by the mayor and aldermen, to permit the prem-

ises to be used for the purpose declared; but they neither express nor imply a condition that the estate should cease, if the premises should ever be applied to another purpose."

By another clause in this conveyance provision was made for the passing of the title to the lands to other parties named, "in case the same shall not be appropriated by the United States for that purpose."

The government went into possession and took steps to locate its works on the lands, but after some years abandoned its plans and this use of it. The court, however, held, construing both the terms "for the location of" and "be appropriated," that the United States took possession of the premises in good faith and commenced the work of constructing the navy yard, and this was a location and appropriation in compliance with the provisions of the deed, and not only was the estate not upon condition and terminated by abandonment of its use for the purpose recited, but said the court, in response to the insistence "that the purpose of the donation having failed, a trust now results to the original proprietors" that "the circumstances of this case do not authorize us to declare that the United States held the property upon an implied trust to employ it for all time for the purposes of a navy yard, and for those purposes only." The court cites with approval as authority for the condition once performed doctrine, *Mead* v. *Ballard,* 7 Wall., 290, 19 L. Ed., 190.

To like effect see *Adams* v. *First Baptist Church,* 148 Mich., 140, 111 N. W., 757, 11 L. R. A. (N. S.), 509. 12 Ann. Cas., 224; *Greene* v. *O'Connor,* 18 R. I., 56, 25 Atl., 692, 19 L. R. A., 262; *Packard* v. *Ames,* 16 Gray (Mass.), 327; *Barker* v. *Barrows,* 138 Mass., 578.

These and many other authorities clearly support the proposition that a provision in a conveyance that it is made for the purpose of locating or maintaining an institution at a given point does not create a condition subsequent, so as to cause a forfeiture should the institution, after having in good faith so located, thereafter abandon that location.

We come now finally to the question of the rights, legal and equitable, of the city of Clarksville with respect to the contribution made by it in 1876, upon the chartering of the Southwestern Presbyterian University.

As an inducement to procure the location at Clarksville of the university, proposed to be organized and patronized by the Southern Presbyterian Church, the city of Clarksville contributed certain bonds of the State of Tennessee to the institution. The bonds had been previously authorized by vote of the city to be delivered to a projected railroad and had been so delivered, but, this railroad project being abandoned, the city recovered said bonds, which were thereupon placed in the hands of certain commissioners—"to be held in trust by them, for the following purposes:

"First. That said bonds of the State of Tennessee with all coupons attached, being about forty-one bonds of $1000, be donated to the Southwestern Presbyterian University, on condition that said university shall be located at Clarksville, Tenn., and that the city of Clarksville shall be entitled to have at all times as many as ten students in said university, to be educated free of charge—and students to be selected from the public schools within the limits, and under the control of the city of Clarksville, for merit and proficiency in their studies."

The foregoing is an excerpt from a resolution passed by the city of Clarksville, and it appears that thereupon the following resolution was passed by the directors of the university corporation:

"Resolved that, in consideration of fifty thousand dollars, in Tennessee bonds (six per cent.) with the coupons attached, except the coupons due on July 1, 1874, received from the city of Clarksville, in the county of Montgomery, in the State of Tennessee, in accordance with an ordinance of the board of mayor and aldermen of said city, passed on the 10th of April, 1874, it is hereby agreed, in conformity to said ordinance, that the said city of Clarksville shall be entitled to have at all times as many as ten students in the Southwestern Presbyterian University, located at Clarksville, Tenn., to be educated free of charge, said students to be selected from the public schools within the limits and under the control of the city of Clarksville, for merit and proficiency in their studies."

We are of opinion that a contractual obligation was thus created on the part of the university, binding it, for the considerations passing, to furnish free education as provided, and that a voluntary removal from a location in which this obligation could be performed, and within the corporate limits of which the city might alone spend its funds, will support a demand for a return or refund of the consideration.

In the first place, the city of Clarksville is a public corporation, and a presumption arises, not imputable to individual donors, that its disposition of public funds is intended as a payment or exchange for value rather than a gift—that in making any transfer of its assets a material return is contemplated. And especially is this true

if the party with whom it deals is a sectarian organization to which otherwise its lawful right to contribute would be questionable. And so too, as already suggested, the matter of location within the city of Clarksville assumes a materiality not applicable to other contributions, in view of the doubtful authority of a municipality to invest its funds beyond its boundaries. In the second place, a reading of the resolution adopted at the time sustains the view that the transaction was an exchange of values rather than a pure gift. It is plainly agreed between the parties that "in consideration of fifty thousand dollars in Tennessee bonds," etc., "it is hereby agreed, in conformity to said ordinance, that the said city of Clarksville shall be entitled to have at all times as many as ten students," etc., to be educated free of charge and selected from the public schools of the city. Here was a substantial consideration, and this contribution by the city to this sectarian institution was probably justified and defended upon the theory that the city was providing for a higher school education for its young men than otherwise could be afforded.

It appears that a tender of the return of these bonds, or their proceeds, was made in the bill herein, on condition of nonresistance on the part of the city. We are of opinion that, regardless of the strict legal rights which we are inclined, for the reasons suggested, to sustain, equity requires the return of these funds to the defendant municipality upon removal of the university from the city of Clarksville. The only other donation, the terms of which is set out in the brief of counsel, is that of Mr. McComb of New York, who in two gifts gave the total sum of $100,000, accompanying each with substantially the following statement:

149 Tenn.—19.

"Being impressed with the importance of the spread of general education, and having confidence in the stability, purposes, and aims of the Southwestern Presbyterian University of Clarksville, as an institution for the furtherance of such education," etc.

Quite obviously McComb had no thought of localizing his gift, but was naturally using the term "Clarksville" as a proper part of the name, or description, of the institution to which he was making his gift for "the spread of general education." Neither this donor nor others in like situation have either legal or equitable grounds of objection to the proposed action of the trustees.

We are of opinion that the costs of this cause should be paid by the complainants, who have filed this bill for instructions, and the sole defendant having, in effect, been awarded a recovery.